Filed 10/28/21  T.S. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| T.S.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>    Real Parties in Interest. | G060512<br><br>(Super. Ct. No. 19DP1093)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Antony C. Ufland, Judge.  Petition denied.

Donna P. Chirco, under appointment by the Court of Appeal, for Petitioner.

No appearance for Respondent.

Leon J. Page, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

No appearance for minor.

\*　　\*　　\*

At the 18–month review hearing in this juvenile dependency case, the court found that placing 15-year-old D.S. in the custody of her mother, T.S. (Mother), would create a substantial risk of detriment to D.S.'s physical and emotional well-being, and that Mother had been provided or offered reasonable services. The court therefore terminated services (except visitation and joint therapy) and set a Welfare and Institutions Code[1] section 366.26 hearing.

Mother seeks writ review of the order, contesting the detriment and reasonable services findings. We issued an order to show cause, the Orange County Social Services Agency (SSA) filed a response, and the parties waived oral argument.

Mother now argues the services offered to her during the final period of reunification were inadequate for a variety of reasons. However, in the court below she argued the services were inadequate for only two reasons: first, because SSA made inadequate efforts to arrange joint therapy between Mother and D.S. as ordered by the court at the 12-month review hearing; and second, because SSA failed to arrange for D.S. to visit Mother in Indiana.

We find no error in the juvenile court's rejection of those assertions. Mother's social worker made consistent efforts to provide joint therapy for Mother and D.S., but her efforts were thwarted by interstate licensing issues and Mother's own failure to communicate and cooperate. Further, the social worker cannot be faulted for not arranging for D.S. to visit Mother in Indiana when Mother refused to allow SSA to assess

---

[1]　　All further statutory references are to this code.

2

her home.  All other contentions regarding inadequacy of services, not raised below, were forfeited.

Mother also argues there was insufficient evidence to support a finding that returning D.S. to her custody would create a substantial risk of detriment.  We disagree. In making that argument, Mother ignores the fact she stipulated to that same finding at the six-month hearing, and the court again made that finding at the 12-month hearing. Mother has made no assertion, and no evidence was offered to demonstrate, that circumstances have changed for the better since then.

When this dependency case was initiated, Mother and D.S. effectively had no relationship because they had been estranged for nearly a decade.  Dependency jurisdiction was sustained against Mother based on the lack of a relationship and Mother's failure to provide for D.S. and her older brother.  Thus, Mother's reunification goals included fostering a relationship with D.S., and obtaining and maintaining housing that was suitable for herself and her child.  We see no evidence that she made significant progress toward either of those goals; we consequently find no error in the court's conclusion that returning D.S. to Mother's custody would create a substantial risk of detriment.

The petition is therefore denied.

## FACTS

In September 2019, D.S., then age 13, and her brother, K.S.,[2] then age 16, were taken into custody on a protective custody warrant after SSA learned their father (Father) had left them alone in a motel room for several days without sufficient food, and Mother's whereabouts were unknown.

---

[2]     Since the filing of the petition K.S. has turned 18 and aged out of the dependency system.

3

The children were placed in the home of their paternal uncle and aunt on September 11, 2019, and efforts were made to contact Mother.

When Mother was located in Indiana, she explained to SSA she had lost contact with the children approximately seven years earlier after a court in Michigan gave custody to Father and allowed him to move to California. Mother claimed she had not learned that was happening until the last minute because Father had sent notice of the hearing to an address that he knew she no longer used. She stated she tried to hire an attorney to fight the custody order, but she was unable to find one who would take her case. She asserted that after Father took the children to California, he changed his phone number, as did other paternal family members she tried to reach. Mother also claimed that although she had primary custody of the children when she and Father divorced in 2007—with Father having custody on alternative weekends and in the summer—Father did not return the children to her after a summer visit in 2011.

SSA later determined that Mother's version of the circumstances under which she lost custody of the children had omitted some details. The children had been removed from Mother's custody by Michigan authorities after she left them alone to go on a job interview. When questioned, Mother explained she had been desperate at the time to find employment, and Father was not available to care for the children. She realized it was a poor decision but stated "I had to do what I had to do."

Both children expressed happiness that Mother had been located, although D.S. claimed to have no memory of her. D.S. also expressed complicated feelings toward Mother and insisted on knowing whether Mother had other children. When the social worker told D.S. that Mother had a four-year-old child, D.S. became tearful and stated she believed Mother had "forgotten about them and moved on." Neither child wanted to leave California, but they both expressed an interest in getting to know their mother again.

4

D.S. informed the social worker she appreciated that she was now "surrounded by family" and "in a nice safe environment" at her uncle's house, but indicated she would also like to attend therapy.

The jurisdiction and disposition hearing was scheduled for October 9, 2019, and the social worker informed Mother she could begin monitored telephone visitations with the children three times per week. However, Mother did not immediately initiate any visitation calls, stating she was unclear as to whether she could. The social worker emphasized the importance of building a relationship with the children and reminded Mother that the uncle had agreed to make the children available for telephone visits.

A Child Family Team (CFT) meeting was held on October 22, with Mother participating by telephone. The purpose of such a meeting is to discuss general case planning and to allow the participants to provide input toward the development of a plan to support the family. Mother participated during the first half of the meeting and related her love for the children; she said she and was grateful for the opportunity to rebuild her relationship with them. Her goal was to relocate the children to Indiana. The children participated during the second half of the meeting, stating they loved Mother very much but wanted to stay in California and have her visit them.

The jurisdiction and disposition hearing was held on October 23, 2019; Father made his first appearance at the hearing, which was continued to November 20.

Mother began telephone visits with the children with mixed results. K.S. expressed concern that Mother did not seem '"genuine"' during their calls. D.S. stated she wanted to get to know Mother, but felt Mother was not honest and open with her—noting Mother would not tell D.S. where she worked or what she did for a living and would not send D.S. a picture of her house. D.S. stated she felt it was "too late" for Mother. The social worker encouraged D.S. to give Mother a chance to get to know her so she might be more comfortable sharing information with her.

The children also reacted negatively to what they viewed as Mother's focus on telling them Bible stories. K.S. disliked the fact Mother referred to him as a "little child," and stated he no longer wanted to talk to her. D.S. said she would like to talk to Mother only one time per week.

Mother stated she was having difficulty connecting with the children during the scheduled calls, because the uncle often did not answer the phone.[3] She also believed the uncle was coaching the children about what to say during the calls. Mother acknowledged she was uncomfortable answering the children's questions about her life because she "does not believe these are questions she should answer over the phone."

Mother also reported that, while she wanted to participate in the counseling and parenting services required in her plan, she was unable to pay for them because she was a single mother. She requested that the court or social services pay for the services.

At the jurisdiction and disposition hearing, Mother submitted on the petition, which alleged that she "has failed to maintain a relationship with the children," that her interest in or ability to provide for them (along with her whereabouts) were unknown, and that she and the Father had a history of domestic violence as evidenced by restraining orders.[4]

As to D.S. specifically, the petition alleged, pursuant to section 300, subdivision (c), that she "has suffered, or is at risk of suffering, serious emotional damage

---

[3] The uncle explained he did not answer the phone on occasions when the children said they did not want to talk to Mother. The social worker reminded the uncle teenagers are temperamental and requested that he continue to make them available for phone calls. He agreed. The social worker also told him he need not continue to monitor the calls as Mother appeared to be appropriate, and the children were old enough to report any concerns they might have.

[4] The allegations against Father were more extensive, including physical abuse of both children. However, because Father has not appealed, we need not address those allegations or his performance during the reunification period.

6

evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior towards herself.  [D.S.]  has expressed a desire to harm herself.  The child, [K.S.], has had to calm [D.S.] down when she has expressed a desire to hurt herself. . . .  [D.S.] would like to attend therapy as she 'tired of being a soldier.'"

The court sustained the petition and found by clear and convincing evidence that to vest custody of the children with the parents would be detrimental.  The children remained with their paternal uncle.

Both Father and Mother were offered reunification services.  Mother's service objectives included:  "keep[ing] all appointments with the assigned social worker," "[m]aintain[ing] relationship with your child by following the conditions of the visitation plan," and "[o]btain[ing] and maintain[ing] a stable and suitable residence for yourself and your children."  Mother was given monitored telephone visitation three times per week, and the social worker was to facilitate in-person visitation when Mother was in California.  Mother's case plan also included counseling and a parent education program.

As of December 2019, D.S. was seeing a therapist biweekly.  By February 2020, D.S. reported she was no longer seeing the therapist as she had "met goals" and was doing better.  Mother began individual therapy in February and was diagnosed with post-traumatic stress disorder (PTSD).  Her goals were to work on emotional trauma and develop coping skills.

In April 2020, Mother voiced her concerns to the social worker that the children were asking her about "family history and the current situation," which she did not want to discuss with them over the phone.  The social worker suggested to Mother that conjoint therapy over the phone might be needed "in the future for processing such issues."

During March and April, the children refused to participate in phone calls with Mother.  They stated it was their own decision whether to communicate with their

7

parents. D.S. complained that "her parents do not show they care, they do not pay for any of their needs, and did not send birthday or Christmas gifts."

In April, Mother reported her individual therapy was completed, and that her provider agreed conjoint therapy with the children may be necessary to assist in developing a relationship. She agreed it should be included as a service in the future.

At the CFT meeting in April 2020, both K.S. and D.S. stated they did not want either in-person visits or phone calls with either parent. The facilitator suggested that "therapeutic phone calls with a therapist could be considered to slowly address issues."

In preparation for the six-month review hearing, SSA developed a service plan for Mother: "As agreed by the children and determined appropriate by the children's therapist, you will participate with the children in individual, conjoint, family, and/or group therapy with a therapist approved by the Social Services Agency to identify and process any unresolved familial issues to strengthen interpersonal relationships with the children. Counseling will continue until such time as the assigned social worker determines in consultation with the therapist that the goals of therapy have been accomplished and therapy is no longer necessary. Frequency of counseling is to be determined by the assigned social worker in consultation with the therapist."

The six-month review hearing was held in May 2020. Mother stipulated that reasonable services had been offered to her, that continued supervision was necessary, that "[t]he child's placement is necessary and appropriate," and that "return of the child to parents would create a substantial risk of detriment to the safety, protection, or physical or emotional well being of the child." The court authorized SSA to pay for a parenting class for Mother in Indiana.

In June and July of 2020, the social worker contacted providers in an effort to arrange "therapeutic phone visitation" with the parents. One provider stated he was

8

too busy, and another reported that she had reached out to the uncle and the uncle had refused the service.

The uncle reported that the children were stressed because the parents had "not written or traveled to LA or CA to make themselves available for the children." The uncle then agreed the social worker should re-refer the children to therapy "for emotional support, assistance with phone contacts, and conjoint therapy as appropriate." Despite that agreement, the uncle did not respond when the provider again initiated contact. When the provider reached out again, the uncle suggested it was the parents who needed therapy.

The children refused phone calls with Mother in September, saying they were too busy with homework and did not want to talk. In November 2020, in connection with the 12-month review hearing, SSA reported that K.S. was only two weeks from his 18th birthday and SSA's recommendation was to terminate reunification services relating to him. SSA also recommended termination of reunification services relating to D.S., who was reported to be doing well in school and happy to remain in her uncle's home along with her brother. D.S. said she felt like she had someone on her side and stated she could not be her best self with her parents.

SSA also reported that Mother had left her full-time job as a health care worker due to COVID and remained in her home while receiving unemployment. She stated she was spending her days doing e-learning and helping her young son with his schoolwork. Her niece was also living with her.

The 12-month review hearing took place on January 21-22, 2021. The court found that returning D.S. to the parents would create substantial risk of detriment to her safety, protection, or physical or emotional well-being, and thus return to parental custody would be inappropriate. However, the court also found that reasonable reunification services had not been offered to the parents during the prior six-month reporting period and consequently continued the case for an additional period of

9

reunification relating to D.S. The court specifically criticized SSA for deferring to decisions by D.S. and her uncle concerning whether visitation and conjoint therapy would happen. It ordered conjoint therapy between D.S. and Mother and D.S. and Father to begin as soon as possible and authorized the necessary funding. An 18-month review hearing was set for March 4, 2021.

On January 26, the social worker sent a referral for joint therapy for D.S. with her parents to Wellnest; Mother agreed to participate. However, on February 2, Wellnest advised the social worker that without a diagnosis, insurance would not cover the therapy. The social worker called two other therapists on February 4. The uncle stated he did not want any services that would require a diagnosis on D.S.'s record.

On February 10, the social worker sent a referral to dozens of SSA providers; one therapist agreed to see D.S. for individual therapy. The social worker was informed that SSA providers cannot provide services out of state, which meant a provider could observe the interaction between D.S. and Mother, but it could not provide conjoint therapy. She informed Mother of that limitation. The social worker monitored video chats between D.S. and Mother.

On February 9, 2021, the social worker sent Mother an Interstate Compact on the Placement of Children (ICPC) referral for a home assessment, but Mother declined, stating she wanted to wait until after the hearing. A CFT meeting was held on February 23, but Mother did not participate. Mother also failed to return the social worker's call on that date, and she did not participate in her monthly phone contact with the social worker.

In a video call on February 24, Mother told D.S. she was "looking at flights to CA and stated she called the CA health department regarding COVID." At the conclusion of the call, both D.S. and Mother said "I love you," and Mother stated "I will be out there" soon. She told D.S. she missed her.

10

But Mother's anticipated trip to California did not occur, and during the next couple of scheduled video calls, D.S. appeared preoccupied and unwilling to engage. She texted the social worker during a call to tell her she did not want to talk. D.S. failed to participate at all in the next few video calls.

The 18-month review hearing, originally set for March 4, 2021, was continued to April 27, 2021, and then to June, and finally to July 15, 2021.

On March 9, the social worker called Mother and left a message requesting that she call back for her mandated monthly contact "to discuss services, referrals, update how to proceed and if she has any questions." On March 24, the social worker called Mother and left a message telling her the options for conjoint therapy were limited because the SSA providers would not do out of state therapy; she suggested Mother call her own previous therapist for a referral.

Meanwhile, D.S. met twice with the local therapist who had offered to observe visitation between D.S. and Mother, but D.S. informed the therapist she did not want therapy or visits with either of her parents. When D.S. failed to show up for consecutive appointments, the therapist closed the case on April 7. That therapist therefore never had the opportunity to observe telephone visits between D.S. and Mother.

On April 22, the social worker again called Mother and left a message requesting that she call back for her required monthly phone contact to discuss the case. She also informed Mother that D.S. had refused counseling, but said she would continue to encourage her to participate in counseling. The social worker again encouraged Mother to "connect with a counselor for services on her end."

On April 27, the social worker reported that Mother had been only "partially compliant with services." She had not communicated monthly with the social worker via telephone as required, she did not attend the CFT meeting, and she refused the ICPC assessment of her home. The report indicated Mother had spoken of a plan to come to California to visit, but she had not done so.

11

On May 20, the social worker called Mother and left a message requesting a call back. The social worker informed Mother that she was still exploring counseling options and again asked Mother if she knew of any counselors in Indiana or if she was connected with one.

On May 21, Mother's previous therapy provider in Indiana contacted the social worker and stated they could provide services and do telehealth with D.S. On May 24, the social worker left Mother a message telling her there were several Indiana counseling services that could help with the joint therapy; she requested Mother to call her back so they could discuss counseling options.

On June 2, SSA reported that "[d]uring this period of supervision, the mother has not maintained contact with the undersigned" and "did not participate in the CFT this period." The report also noted the social worker had contacted Mother to inform her that "several counseling services in Indiana indicate they may be able to work with out of State services as long as she is the active client and has Indiana insurance," but that "[i]t is unknown if the mother is participating in therapy as suggested by [the social worker] for possible conjoint therapy between the mother and the youth through an Indiana provider." The report also noted that "[t]he mother's home has not been approved for reunification as the mother previously declined the ICPC referral."

On June 21, the social worker was unable to contact Mother because her phone did not appear to be operational. The social worker e-mailed Mother to request that she call for her required monthly contact and for information about counseling. By the time of the July 15 hearing, the social worker still had not made contact with Mother; she had not spoken with Mother since February. During that same period, however, Mother was consistently available for telephone visitation with D.S.

At the July hearing, the court admitted SSA's reports into evidence and the social worker was cross-examined. The social worker explained she was recommending that D.S. not be returned to Mother's custody because D.S. was stable and happy in her

placement and wished to remain there, and because Mother had not made a sufficient effort to develop and further a relationship with D.S. The social worker noted Mother had never traveled to California to meet with D.S. during the entire dependency period. The social worker acknowledged she had not specifically advised Mother to visit California, but stated she had talked to Mother about the possibility of having D.S. visit Indiana, including setting up an ICPC process to have Mother's home approved for the visit. Mother had declined that.

The social worker testified that during the period since January 2021, she left messages for Mother suggesting Mother see a therapist in Indiana and asking her to let the social worker know if she had "connected with anybody."

In support of its recommendation that D.S. not be returned to parental custody, SSA reported that the social worker had made consistent efforts to arrange conjoint therapy, facilitate visitation, and offer additional services to overcome D.S.'s resistance to reunifying with her parents, but that D.S. had been "resolute and decisive in her preference not to reunify with the parents . . . ." SSA also pointed out that "the social worker has had challenges maintaining contact with Mom, having Mom not return her phone calls, not return her efforts for communication, not respond to emails, not respond to requests for contact, even when supervising visitation. Mom has utilized her visitation but has not, again, availed herself of the opportunity to have her home evaluated via an ICPC. Mother declined that opportunity."

Mother did not testify at the July 15 hearing, although she was present via phone link.

SSA made clear its hope that D.S. and her parents would "continue to build their relationship, but at this time the time for reunification has expired." It characterized Mother's recent efforts as "half-hearted" and "minimal."

Counsel for D.S. agreed with SSA: "This is not the type of case where you can even consider, in our opinion, placing a child out of state without services being in

13

place because this child has been damaged in the past." Counsel also noted that D.S. began the dependency process with a sustained finding that she was at risk of significant emotional injury, which counsel believed "speaks volumes" about D.S. and her feelings. Counsel argued D.S. remained fragile, pointing out that the reports were replete with evidence she was constantly worried about being forced to leave her uncle's home.

D.S.'s counsel did not fault SSA for the failure to arrange joint therapy with Mother: "licensing requirements put a hold on meaningful therapy between Mother and [D.S.]. That requirement is really beyond [SSA], beyond California. It's really something that the Interstate Compact needs to address on a level across this country."

Mother's counsel objected to SSA's reliance on Mother's refusal to participate in an ICPC assessment of her home as evidence she could not presently house D.S., arguing that "she has a house. She has an address. There's been no information that her house is not able to house youths." Mother's counsel also argued there was no substantial evidence that returning D.S. to Mother's custody would subject D.S. to substantial risk of severe emotional harm because no psychiatrist or therapist had offered evidence to support such a finding. Counsel argued the fact D.S. did not want to live with Mother was insufficient to support the finding.

Mother's counsel defended Mother's failure to travel to California, claiming "there's a multitude of different reasons . . . as to why she couldn't come. That doesn't mean that she didn't want to come in person and see her child." Counsel argued SSA had not made sufficient efforts to arrange joint therapy for Mother and D.S., claiming that "it wasn't until the end of May that the social worker . . . contacted Mother's old . . . counseling service at Edgewater to see if they would be able to do a joint session between Mother and [D.S.]."

The juvenile court adopted SSA's recommendation to terminate reunification services and found that a return of D.S. to parental custody would create a substantial risk of detriment to the safety and protection or physical or emotional

14

well-being of the child. The court stated, "the danger in returning [D.S.], as far as the court is concerned at this point, is that [the] relationship[s] stand exactly where they were before because that conjoint counseling has not occurred." The court also indicated Mother's refusal of the ICPC assessment played a part in its analysis.

The court explained it believed conjoint therapy was necessary to facilitate establishing a relationship between D.S. and her parents. It ordered further funding for joint therapy between the hearing and the section 366.26 hearing, which it scheduled for November 9, 2021. The court spoke to Mother directly and told her that if she "does not communicate, doesn't get back to the social worker, there is little that the social worker can do. Nobody can do this counseling for Mother." Finally, the court observed that if Mother were able to travel to California for counseling: "It's obviously something that's easier to happen here than across state lines."

In its written order, the court stated it was "mak[ing] orders and findings pursuant to proposed orders and findings filed July 15, 2021."

### DISCUSSION

1.   *Whether Services Were Reasonable*

Mother first contends that her reunification services must be extended because the services offered to her were not reasonable. She raised the same issue in the trial court where she argued SSA made insufficient efforts to arrange joint therapy with D.S. during the period following the 12-month hearing and failed to arrange for D.S. to visit her in Indiana. We find no error in the trial court's rejection of those arguments.

The "adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the

15

services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

"To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .'" (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

The record reflects the social worker tried to find a joint therapy provider. She contacted "a dozen" providers, only to learn they could not treat a parent who was out of state. When the social worker concluded in February that none of SSA's providers could offer services to an out-of-state patient, she promptly informed Mother of the problem.

Over the next few months, the social worker repeatedly called Mother, leaving messages asking her to call back so they could discuss services and "update how to proceed . . . ." She reminded Mother that SSA providers could not do out of state therapy, and suggested Mother contact her own previous therapist for a referral. The social worker did not receive a call back from Mother.

Finally, in May 2021, two months after the social worker first suggested that Mother should contact her previous mental health provider, and a day after she had again called Mother to repeat that suggestion, the social worker was contacted by Mother's prior provider, stating they could offer the joint therapy if Mother arranged it with them. The social worker promptly contacted Mother to tell her there were Indiana counseling services available for joint therapy, and asking her to call back so they could discuss some options. Mother did not respond.

As the juvenile court recognized, those facts do not reflect a failure on the social worker's part. She was initially thwarted in her efforts to arrange joint therapy

16

through an SSA provider because Mother was out of state. She then encouraged Mother, repeatedly, to contact her prior Indiana provider to see if the therapy could be arranged through them. It was Mother, not the social worker, who failed to follow through.

It may be that Mother had good reasons for her failure to respond. If so, we are unaware of her explanation because Mother never explained herself to the social worker; nor did she testify at the 18-month hearing.

Mother implies in her petition she may have been financially unable to arrange for a therapist in Indiana; she outright argues that SSA acted unreasonably in suggesting Mother should pursue therapy using her own insurance since the court had ordered SSA to make funding available for the therapy. But these are not arguments Mother made below; they are consequently forfeited. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 ["Dependency matters are not exempt from [the] rule" that "a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"].)

Without a factual record developed below, we cannot evaluate whether or to what extent the social worker was obligated to offer funding to an Indiana mental health provider even if Mother's own insurance would have covered it, or whether the trial court would have viewed it as improper for the social worker to suggest that Mother rely on her own insurance. In any event, if using her own insurance presented an impediment to Mother, she could have discussed the issue with the social worker and made an effort to resolve it. She did not.

The assertion that the services were deficient because SSA did not arrange for D.S to visit Mother in Indiana is not repeated in Mother's petition. We note nonetheless that such a visit would have followed an evaluation of Mother's home to determine it was suitable. When the social worker attempted to arrange the assessment of Mother's home in February 2021—relying on Indiana child welfare officials to complete the assessment under the auspices of the ICPC—Mother refused to allow it, saying she

17

wanted to wait until *after* the 18-month hearing.  In light of Mother's refusal to make her home available for assessment, SSA cannot be faulted for failing to arrange an Indiana visit.

Mother makes additional factual arguments in her petition, not made in the court below, to support her contention that services were inadequate.  However, as we have already explained, such arguments are forfeited.  (*In re S.B., supra*, 32 Cal.4th at p. 1293.)   But even if they weren't forfeited, we would note that Mother's complaints about D.S.'s uncle interfering with visitation or therapy efforts are based almost entirely on his conduct during the first six-months of reunification.  Since Mother stipulated that reunification services were reasonable during that period, she cannot argue otherwise now.

Finally, while Mother suggests the social worker failed to "nurture" D.S.'s initial feeling that she "might want to live with Mother," she does not explain what she thinks the social worker should have done to accomplish that goal.  The record demonstrates that D.S. herself made repeated efforts to get to know Mother, to learn about her life and explore the family's shared history, and to forge a connection with her.

For whatever reason, it was Mother who repeatedly rebuffed D.S.'s efforts, stating she did not think it was appropriate to discuss her life, or the parties' shared past, over the telephone.  At the same time, Mother never visited D.S. or her brother in California, nor did she seek to facilitate their visitation in Indiana.  Taken together, these facts strongly suggest that it was Mother, rather than the social worker, who impeded D.S.'s efforts to develop their relationship.

For the foregoing reasons, we find no error in the juvenile court's determination that reasonable services were offered to Mother during the final period of reunification.

18

2. *Whether Return to Mother Would be Detrimental*

Mother also argues the court erred by finding that return of D.S. to Mother's custody would create a substantial risk of detriment to her safety, protection or physical or emotional well-being. As Mother points out, the burden is on SSA to affirmatively show detriment. (See *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738.) According to Mother, there is insufficient evidence to support that finding in this case. Again, we disagree.

Mother's argument ignores the fact that the court made a finding of detriment when it initially sustained the petition and ordered the children to be placed in the custody of SSA. The jurisdictional findings sustained against Mother were that she had failed to maintain a relationship with the children and had failed to provide for them. Having failed to challenge the sufficiency of those findings to support the disposition, Mother cannot do so now. (*In re T.G.* (2010) 188 Cal.App.4th 687, 692 ["'Generally . . . a parent may not attack the validity of a prior appealable order for which the statutory time for filing an appeal has passed'"].)

Mother stipulated to the same detriment finding at the six-month hearing, and the court made that finding again at the 12-month hearing. Each of those findings was also part of a final, appealable order, and cannot be challenged except on direct appeal.

Of course, neither of those orders, which were based on findings that a significant risk of detriment then existed, would necessarily mean that the risk continued to exist at the time of the 18-month hearing. In many cases, the circumstances of a dependency change during the six-month period between review hearings. In this case, however, they did not. At least not in any way that might undermine the prior finding of detriment.

The only significant change since the 12-month hearing reflected by our record is that D.S.'s older brother, K.S., had aged out of the dependency system and the

19

court therefore lost jurisdiction to adjudicate his "custody." Consequently, an order transferring custody of D.S. to Mother in Indiana would not only have removed her from her uncle's home—which she had identified as her first stable placement and a source of strength—but would also have separated D.S. from the brother who had been her only constant bond throughout a chaotic childhood.

The significance of maintaining that sibling connection would be a significant factor in establishing detriment. Thus, in *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1423, the court explained why the relationship existing between dependent children and other siblings might justify placing them in the custody of a local relative, rather than an out-of-state parent. "The evidence in this case showed the children's relationship with their siblings was manifestly important to them and that relationship could not be maintained if they moved to Ohio. Based on the court's obligation to focus on their well-being once they were declared dependents, the court could properly consider any factor that would cause them detriment, including disruption of their relationship with [siblings]." (*Ibid.*)

The court did not appear to consider that factor in this case, but it had no need to. Other than D.S. getting a bit older, nothing else had changed since the 12-month hearing, when the court made its most recent detriment finding. The relationship between D.S. and Mother had not improved. Mother had yet to visit D.S. in person (although she told D.S. she was planning to do so), and there was no evidence that Mother was yet ready or able to provide D.S. with a suitable home.

The cases Mother relies upon, including *In re Abram L.* (2013) 219 Cal.App.4th 452, 464, are distinguishable. As Mother points out, *Abram L.* involved an appeal of the juvenile court's finding of detriment made at the disposition hearing, i.e., the court's initial determination of that issue. Here, by contrast, Mother elected not to challenge the court's finding of detriment at the disposition hearing, and she is bound by it. It is too late for her to argue, in effect, that the circumstances of her estrangement

20

from D.S., their lack of any relationship, and the connections D.S. had with her paternal relatives in California are not a sufficient basis for a detriment finding. (See also *In re John M*. (2006) 141 Cal.App.4th 1564 [appeal from dispositional order]; *In re Patrick S.* (2013) 218 Cal.App.4th 1254 [same.].)

Finally, even if we weren't convinced that the court's detriment finding was otherwise supported by the record, we would affirm its decision on the basis that Mother refused to allow her home to be assessed prior to the 18-month hearing. Mother contends that she could not be denied custody based on the lack of an ICPC; her contention is misplaced.

Mother relies on cases which establish that the lack of an ICPC—meaning a full-blown cooperative agreement under which a remote state evaluates the potential placement of a dependent child within its jurisdiction, agrees that the child will not be harmed by placement, and provides services to facilitate that placement—cannot be used as a basis to deny custody to a *parent*. (See *In re John M., supra*, 141 Cal.App.4th at p. 1575; *In re C.B*. (2010) 188 Cal.App.4th 1024, 1032.) We agree. But neither the court nor SSA was attempting to set up an ICPC placement agreement with Indiana.

SSA was relying on child welfare officials in Indiana to do an assessment of Mother's home to determine whether it was suitable for D.S. That was appropriate. As explained in *In re Suhey G*. (2013) 221 Cal.App.4th 732, 743, "[a]lthough an ICPC evaluation was not legally required prior to placing [a child] with [a parent], the court had discretion to use such an evaluation 'as a means of gathering information' about [the parent] for the purposes of determining whether placing [the child] with him would be detrimental to her." Any other rule would mean that a parent who resides outside of California could achieve reunification with a child without ever allowing any child welfare agency to assess the suitability of the parent's home.

One of the goals of Mother's reunification plan from the outset was that she "[o]btain and maintain a stable and suitable residence for yourself and your children."

The only way SSA could determine whether that goal was met was to assess Mother's home.  Mother's refusal to cooperate in that assessment was fatal to the reunification effort.

## DISPOSITION

The petition is denied.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.